## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY COMPANY,

      Plaintiffs,

vs.

Case No.:

HASAN ISMAIL ZEYA, M.D., JRL REHABILITATION CENTER, INC., ANISLEY LANZA DIAZ, L.M.T., IVAN CHINEA RAMOS, JEROME C. COUVE, L.M.T., MILAGROS TORRES, L.M.T., GEOVANI ROBAINA FERNANDEZ, PALM WELLNESS CENTER, LLC, MICHEL REYES, L.M.T., ALYE ORTEGA, L.M.T., RONALD OSCAR SUAREZ, L.M.T., REHAB & HEALTHCARE OF TAMPA, INC., JOSE RODRIGUEZ-SUAREZ, ODAMIS RODRIGUEZ ROQUE, L.M.T., YANET QUINTERO ROJAS, L.M.T., ROBUST PAIN & WELLNESS MEDICAL CENTER, INC., LILISBET CAMPOS-GARCIA, KENIA MONTES, 7520 REHABILITATION CENTER, LLC, ARELYS RUBIO, IVAN CVIK, M.D., CARLOS E. FOSSI, M.D., YUDENYS RUIZ ALVAREZ, L.M.T., TAMPA BAY REHABILITATION CENTER, INC., YOSVANY MORAN, NELSON CABALLERO, L.M.T., SEMINOLE CARE & REHABILITATION CENTER, INC., ALEXIS DEL SOL PEREZ, L.M.T., MARIA ROMERO, MARTIZA A. DAMAS DOMINGUEZ, L.M.T., and SAMMIE T. BOND, L.M.T.,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1.      This action seeks to recover more than $6,600,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants JRL Rehabilitation Center, Inc. ("JRL Rehabilitation"), Palm Wellness Center, LLC ("Palm Wellness"), Rehab & Healthcare of Tampa, Inc. ("Rehab & Healthcare"), Robust Pain & Wellness Medical Center, Inc. ("Robust Pain"), 7520 Rehabilitation Center, LLC ("7520 Rehabilitation"), Tampa Bay Rehabilitation Center, Inc. ("Tampa Bay Rehabilitation"), and Seminole Care & Rehabilitation Center, Inc. ("Seminole Care") (collectively, the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, and physical therapy services (collectively the "Fraudulent Services") that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through the respective Clinic Defendants, because of the fraudulent and unlawful activity set forth herein.

2.      Each and every charge submitted through the Clinic Defendants since at least 2013 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" – "7" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted to GEICO by mail through the respective Clinic Defendants. Defendants' interrelated fraudulent schemes began no later than 2013, and have continued uninterrupted since that time.

## THE PARTIES

3.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

4.      The Defendants are as follows:

(i)      Defendant Hasan Ismail Zeya, M.D. ("Zeya") resides in and is a citizen of Florida. Zeya was licensed to practice medicine in Florida on December 18, 1981. Zeya, who was in his early-to-late 80s at the time, falsely purported to serve as medical director at JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, and Robust Pain, and purported to perform or directly supervise most of the Fraudulent Services on behalf of each of the Clinic Defendants.

(ii)     Defendant JRL Rehabilitation is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, JRL Rehabilitation falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Florida Health Care Clinic Act (the "Clinic Act", Fla. Stat. § 400.990, et seq.). JRL Rehabilitation was incorporated in Florida on or about January 17, 2006, during all relevant times purported to be owned

and controlled by Defendants Ivan Chinea Ramos ("Ramos') and Anisley Lanza Diaz, L.M.T. ("Lanza Diaz"), falsely purported to have Zeya as its legitimate medical director, had Defendant Geovani Robaina Fernandez ("Fernandez") as its "office manager", and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Zeya, Lanza Diaz, Jerome C. Couve, L.M.T. ("Couve") and Milagros Torres, L.M.T. ("Torres") (Defendants JRL Rehabilitation, Ramos, Lanza Diaz, Zeya, Fernandez, Couve, and Torres collectively are referred to as the "JRL Rehabilitation Defendants").

(iii)   In or around early July 2019, Ramos and Fernandez were arrested on charges that they made false insurance claims, engaged in patient brokering, and engaged in an organized scheme to defraud insurers at JRL Rehabilitation. In or around early July 2019, Torres was arrested on charges that she made false insurance claims and engaged in an organized scheme to defraud insurers at JRL Rehabilitation.

(iv)   Defendant Palm Wellness is a Florida limited liability company with its principal place of business in Tampa, Florida. At all relevant times, Palm Wellness falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Palm Wellness was organized in Florida on or about December 30, 2014, purported to be owned and controlled by Defendant Michel Reyes, L.M.T. ("Reyes"), had Reyes as its sole member, falsely purported to have Zeya as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Zeya, Reyes, Alye Ortega, L.M.T. ("Ortega"), and  Ronald Oscar Suarez, L.M.T. ("Suarez") (Defendants Palm Wellness, Reyes, Zeya, Ortega, and Suarez collectively are referred to as the "Palm Wellness Defendants").

(v)   Defendant Rehab & Healthcare is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Rehab & Healthcare falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Rehab & Healthcare was incorporated in Florida on or about July 30, 2013, purported to be owned and controlled by Defendant Jose Rodriguez-Suarez ("Rodriguez-Suarez"), falsely purported to have Zeya as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were

performed by Defendants Zeya, Yanet Quintero Rojas, L.M.T. ("Rojas") and Odamis Rodriguez Roque, L.M.T. ("Roque") (Defendants Rehab & Healthcare, Rodriguez-Suarez, Zeya, Rojas, and Roque collectively are referred to as the "Rehab & Healthcare Defendants").

(vi)     Defendant Robust Pain is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Robust Pain falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Robust Pain was incorporated in Florida on or about March 19, 2018, purported to be owned and controlled by Defendants Roque, Kenia Montes ("Montes"), and Lilisbet Campos-Garcia ("Campos-Garcia"), falsely purported to have Zeya as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Zeya and Roque (Defendants Robust Pain, Roque, Montes, Campos-Garcia, and Zeya collectively are referred to as the "Robust Pain Defendants").

(vii)    On September 12, 2019, Roque was arrested on charges that she made false insurance claims and engaged in patient brokering.

(viii)   Defendant 7520 Rehabilitation is a Florida limited liability company with its principal place of business in Tampa, Florida. At all relevant times, 7520 Rehabilitation falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. 7520 Rehabilitation was organized in Florida on or about September 15, 2009, purported to be owned and controlled by Defendant Arelys Rubio ("Rubio"), had Rubio as its sole member, falsely purported to have Defendants Ivan Cvik, M.D. ("Cvik") and Carlos E. Fossi, M.D. ("Fossi") as its legitimate medical directors, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Zeya and Yudenys Ruiz Alvarez, L.M.T. ("Alvarez") (Defendants 7520 Rehabilitation, Rubio, Cvik, Fossi, Zeya, and Alvarez collectively are referred to as the "7520 Rehabilitation Defendants").

(ix)     Defendant Tampa Bay Rehabilitation is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Tampa Bay Rehabilitation falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Tampa Bay Rehabilitation was

incorporated in Florida on or about November 30, 2016, purported to be owned and controlled by Defendant Yosvany Moran ("Moran"), falsely purported to have Cvik as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Zeya and Nelson Caballero, L.M.T. ("Caballero") (Defendants Tampa Bay Rehabilitation, Moran, Cvik, Zeya, and Caballero collectively are referred to as the "Tampa Bay Rehabilitation Defendants").

(x)   Defendant Seminole Care is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Seminole Care falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Seminole Care was incorporated in Florida on or about January 24, 2018, purported to be owned and controlled by Defendants Maria Romero ("Romero") and Alexis Del Sol Perez, L.M.T. ("Del Sol Perez"), falsely purported to have Fossi as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers including billing for Fraudulent Services that purportedly were performed by Defendants Zeya, Martiza A. Damas Dominguez, L.M.T. ("Dominguez"), and Sammie T. Bond, L.M.T. ("Bond") (Defendants Seminole Care Rehabilitation, Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond collectively are referred to as the "Seminole Care Defendants").

(xi)   All of the natural person Defendants reside in and are citizens of Florida.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

6.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

7.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

8.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS**

I.    **Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement**

9.    Florida requires automobile insurers to provide PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

10.    Under the No-Fault Law, a health care services provider that possesses an assignment of PIP Benefits from an Insured and that provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

11.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, and the bill for the service cannot misrepresent the nature or extent of the service that was provided. Insurers such as

7

GEICO are not required to pay anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges. <u>See</u> Fla. Stat. § 627.736.

12.     In addition, the No-Fault Law prohibits PIP reimbursement for massage or for services provided by unsupervised massage therapists. <u>See</u> Fla. Stat. § 627.736.

13.     Pursuant to the Clinic Act, clinics operating in Florida without a valid exemption from the relevant clinic licensing requirements must – among other things – appoint a medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. <u>See</u> Fla. Stat. § 400.9935(1).  In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1).

14.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge." <u>See</u> Fla. Stat. § 400.9935(3).

## II.     <u>Defendants' Interrelated Fraudulent Schemes</u>

### A.     The Fraudulent Operation of the Clinic Defendants Without Legitimate Medical Directors

15.     Because the Clinic Defendants were subject to the Clinic Act, Ramos, Lanza Diaz, Reyes, Rodriguez-Suarez, Roque, Montes, Campos-Garcia, Rubio, Moran, Romero, and Del Sol Perez (collectively the "Clinic Owner Defendants") could not

operate the Clinic Defendants unless licensed physicians were employed as the medical directors at the Clinic Defendants. However, if the Clinic Owner Defendants retained legitimate physicians to serve as the Clinic Defendants' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director, which would impede the Defendants' interrelated schemes, as described herein.

16.     Accordingly:

(i)     Ramos and Lanza Diaz, Reyes, Rodriguez-Suarez, and Roque, Montes, and Campos-Garcia retained Zeya, a licensed physician who was willing – in exchange for compensation – to falsely pose as the legitimate medical director at JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, and Robust Pain, respectively;

(ii)    Rubio and Moran retained Cvik, a licensed physician who was willing – in exchange for compensation – to falsely pose as the legitimate medical director at 7520 Rehabilitation and Tampa Bay Rehabilitation, respectively; and

(iii)   Rubio and Romero and Del Sol Perez retained Fossi, a licensed physician who was willing – in exchange for compensation – to falsely pose as the legitimate medical director at Tampa Bay Rehabilitation and Seminole Care, respectively.

17.     However, Zeya, Cvik, and Fossi (collectively the "Medical Director Defendants") never genuinely served as medical directors for the respective Clinic Defendants. Instead, from the beginning of each of their associations with the respective Clinic Defendants, they ceded all day-to-day decision-making and oversight regarding health care services to the respective Clinic Owner Defendants and their associates.

18.     As set forth herein, in keeping with the fact that the Medical Director Defendants never legitimately served as the medical directors at the Clinic Defendants, the Medical Director Defendants: (i) never ensured that all health care practitioners at the Clinic Defendants had active appropriate certification or licensure for the level of care being provided; (ii) never conducted systematic reviews of the Clinic Defendants' billings to ensure that the billings were not fraudulent or unlawful; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through the Clinic Defendants, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

19.     In further keeping with the fact that Zeya never legitimately served as medical director at either JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, or Robust Pain, Zeya simultaneously: (i) purported to serve as medical director at all four clinics; and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services for all of the Clinic Defendants, as well as for other clinics in Florida.

20.     It is impossible that Zeya could have simultaneously personally performed, or even just directly supervised, such a massive number of individual health care services for all the Clinic Defendants, as well as for other clinics, while also fulfilling his medical director role at JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, and Robust Pain.

21.     The Clinic Owner Defendants used the façade of the Medical Director Defendants' phony "appointments" as the Clinic Defendants' respective "medical

directors" to do indirectly what they were forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate health care clinics without legitimate medical directors; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at the Clinic Defendants; (iii) to permit health care services to be provided at the Clinic Defendants by individuals who lacked the proper licensure to perform the services; and (iv) to use the Clinic Defendants as vehicles to submit a massive amount of fraudulent and unlawful PIP billing to GEICO and other insurers.

22.     The Medical Director Defendants unlawfully permitted the Clinic Owner Defendants to dictate every aspect of the manner in which Insureds would be treated at the respective Clinic Defendants, and to dictate every aspect of the manner in which health care services at these clinics would be billed to GEICO and other insurers, because they sought to continue profiting from the fraudulent billing submitted through these clinics.

**B.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

23.     Each of the Defendants caused GEICO to be billed for a limited range of Fraudulent Services, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibits "1" – "7", the purported physical therapy services constituted the vast majority of the Fraudulent Services billed through each of the Clinic Defendants to GEICO.

24.    All of the "physical therapy" services that Defendants purported to provide between at least 2013 and the present were performed – to the extent that they were performed at all – by completely unsupervised massage therapists including: (i) Lanza Diaz, Couve, and Torres at JRL Rehabilitation; (ii) Reyes, Ortega, and Suarez at Palm Wellness; (iii) Roque and Rojas at Rehab & Healthcare; (iv) Roque at Robust Pain; (v) Alvarez at 7520 Rehabilitation; (vi) Caballero at Tampa Bay Rehabilitation; and (vii) Del Sol Perez, Dominguez, and Bond at Seminole Care.

25.    Lanza Diaz, Couve, Torres, Reyes, Ortega, Suarez, Rojas, Roque, Alvarez, Caballero, Del Sol Perez, Dominguez, and Bond (collectively the "Massage Therapist Defendants") were only licensed as massage therapists. The Massage Therapist Defendants were never licensed as physical therapists, physicians, or chiropractors.

26.    The Defendants were well-aware of the fact that health care clinics such as the Clinic Defendants could not legally recover PIP Benefits for "physical therapy" or any other kinds of health care services performed by unsupervised massage therapists such as the Massage Therapist Defendants.

27.    Accordingly, in 2013, the Defendants began to falsely represent – in a substantial majority of the bills for "physical therapy" services that they submitted or caused to be submitted through the respective Clinic Defendants to GEICO – that Zeya, a licensed physician, had either personally performed or directly supervised the putative physical therapy services.

28.    In reality, Zeya neither performed nor supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO.

12

29.     In keeping with the fact that Zeya neither performed nor directly supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO, Zeya – who was between approximately 82 and 90 years old during the relevant time – often purported to personally perform or directly supervise more than  20, 30, or even 40 hours of  "physical therapy" services for GEICO Insureds on individual dates, often at several of the Clinic Defendants, and at several different locations, per day.

30.     For example:

(i)     On December 28, 2015, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 36 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) three 45-minute  new patient examinations that were performed on three GEICO Insureds at JRL Rehabilitation; and (b) 122 additional physical therapy services purportedly provided to at least 20 additional GEICO Insureds at JRL Rehabilitation, Palm Wellness, Nova Care, Robust Pain, and West Florida, including at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on December 28, 2015.

(ii)    On January 11, 2016, Palm Wellness, Reyes, and Zeya purported to provide at least 42 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds

throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least: (a) two 45-minute  new patient examinations and one 40-minute follow-up examination that were performed on three GEICO Insureds at JRL Rehabilitation and Rehab & Healthcare; and (b) 103 <u>additional</u> physical therapy services purportedly provided to at least 17 <u>additional</u> GEICO Insureds at JRL Rehabilitation, Nova Care, Robust Pain, Rehab & Healthcare, and West Florida, including at least 15 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on January 11, 2016.

(iii)   On April 25, 2016, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 47 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least 135 <u>additional</u> physical therapy services purportedly provided to at least 19 <u>additional</u> GEICO Insureds at JRL Rehabilitation, Nova Care, Palm Wellness, and West Florida, including at least 16.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.75 hours of services that Zeya purported to personally perform, or at least directly supervise, on April 25, 2016.

(iv)   On October 4, 2016, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 60 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least 79 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Rehab & Healthcare, Nova Care, and Palm Wellness,

including at least 13.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23 hours of services that Zeya purported to personally perform, or at least directly supervise, on October 4, 2016.

(v)     On December 2, 2016, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 91 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least: (a) one 45-minute new patient examination and one 25-minute follow-up examination that were performed on two GEICO Insureds at JRL Rehabilitation; and (b) 100 <u>additional</u> physical therapy services purportedly provided to at least 14 <u>additional</u> GEICO Insureds at Rehab & Healthcare, Nova Care, West Florida, and Palm Wellness, including at least 13.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28 hours of services that Zeya purported to personally perform, or at least directly supervise, on December 2, 2016.

(vi)    On December 28, 2016, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 92 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least: (a) one 25-minute follow-up examination and one 15-minute follow-up examination that were performed on two GEICO Insureds at Rehab & Healthcare and JRL Rehabilitation; and (b) 124 <u>additional</u> physical therapy services purportedly provided to at least 16 <u>additional</u> GEICO Insureds at Rehab & Healthcare, Nova Care, and Palm Wellness, including at least 19.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at

least 34.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on December 28, 2016.

(vii)   On January 10, 2017, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 86 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) one 45-minute new patient examination that was performed on a GEICO Insured at Rehab & Healthcare; and (b) 119 additional physical therapy services purportedly provided to at least 17 additional GEICO Insureds at Rehab & Healthcare, Nova Care, and Palm Wellness, including at least 17.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 31.75 hours of services that Zeya purported to personally perform, or at least directly supervise, on January 10, 2017.

(viii)  On March 20, 2017, Palm Wellness, Reyes, and Zeya purported to provide at least 66 individual physical therapy services to at least 11 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least 77 additional physical therapy services purportedly provided to at least 12 additional GEICO Insureds at JRL Rehabilitation, West Florida, and Rehab & Healthcare, including at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.75 hours of services that Zeya purported to personally perform, or at least directly supervise, on March 20, 2017.

(ix)    On April 24, 2017, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 46 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one

of those treatments. What is more, those putative treatments included at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least 97 <u>additional</u> physical therapy services purportedly provided to at least 16 <u>additional</u> GEICO Insureds at 7520 Rehabilitation, West Florida, Palm Wellness, and Rehab & Healthcare, including at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on April 24, 2017.

(x)     On September 5, 2017, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 103 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise: (a) two 25-minute patient examinations that were performed on two <u>additional</u> GEICO Insureds at Rehab & Healthcare; and (b) at least 51 <u>additional</u> physical therapy services purportedly provided to at least 9 <u>additional</u> GEICO Insureds at 7520 Rehabilitation, West Florida, Tampa Bay Rehabilitation, Palm Wellness, and Rehab & Healthcare, including at least 7.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23 hours of services that Zeya purported to personally perform, or at least directly supervise, on September 5, 2017.

(xi)     On October 2, 2018, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 66 individual physical therapy services to at least ten individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at

least 123 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at 7520 Rehabilitation, Palm Wellness, Tampa Bay Rehabilitation, Robust Pain, and JRL Rehabilitation, including at least 16.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.75 hours of services that Zeya purported to personally perform, or at least directly supervise, on October 2, 2018.

(xii)   On November 5, 2018, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 60 individual physical therapy services to at least ten individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least: (a) one 30-minute patient examination that was performed on one GEICO Insured at Robust Pain; and (b) at least 109 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at 7520 Rehabilitation, JRL Rehabilitation, West Florida, Tampa Bay Rehabilitation, Robust Pain, and Palm Wellness, including at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on November 5, 2018.

(xiii)  On December 12, 2018, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 56 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least ten hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least: (a) one 30-minute patient examination, one 25-minute patient examination, and one 5-minute patient examination that were performed on three GEICO Insureds at JRL Rehabilitation, Robust Pain, and Tampa Bay Rehabilitation; and (b) 168 <u>additional</u> physical therapy services purportedly provided to at least 26 <u>additional</u> GEICO

Insureds at 7520 Rehabilitation, Palm Wellness, Tampa Bay Rehabilitation, Seminole Care, West Florida, Robust Pain, and JRL Rehabilitation, including at least 22 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 33 hours of services that Zeya purported to personally perform, or at least directly supervise, on December 12, 2018.

(xiv)   On January 24, 2019, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 119 individual physical therapy services to at least 14 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) two 30-minute patient examinations and one 5-minute patient examination that were performed on three GEICO Insureds at JRL Rehabilitation and Seminole Care; and (b) at least 192 additional physical therapy services purportedly provided to at least 32 additional GEICO Insureds at 7520 Rehabilitation, Rehab & Healthcare, Seminole Rehabilitation, Tampa Bay Rehabilitation, Robust Pain, and Palm Wellness, including at least 28.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 47.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on January 24, 2019.

(xv)    On February 4, 2019, JRL Rehabilitation, Ramos, and Zeya purported to provide at least 78 individual physical therapy services to at least ten individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) one 15-minute patient examination and one 5-minute patient examination that were performed on two GEICO Insureds at Rehab & Healthcare and Seminole Care; and (b) 115 additional physical therapy services purportedly provided to at least 20 additional GEICO Insureds at 7520

Rehabilitation, West Florida, Tampa Bay Rehabilitation, Palm Wellness, Robust Pain, Seminole Rehabilitation, and Rehab & Healthcare, including at least 20 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32 hours of services that Zeya purported to personally perform, or at least directly supervise, on February 4, 2019.

(xvi)   On March 4, 2019, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 57 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least ten hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) four 15-minute patient examinations and three 5-minute patient examinations that were performed on seven GEICO Insureds at 7520 Rehabilitation and Seminole Care; and (b) 206 additional physical therapy services purportedly provided to at least 32 additional GEICO Insureds at 7520 Rehabilitation, Palm Wellness, Tampa Bay Rehabilitation, Max Health Wellness Corp ("Max Health"), West Florida, Seminole Rehabilitation, and JRL Rehabilitation, including at least 28.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 39.5 hours of services that Zeya purported to personally perform, or at least directly supervise, on March 4, 2019.

(xvii)  On April 23, 2019, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 45 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) two 15-minute patient examinations that were performed on two GEICO Insureds at Rehab & Healthcare and Palm Wellness; and (b) 142 additional physical therapy services purportedly provided to at least 22 additional GEICO Insureds at 7520 Rehabilitation, Palm

Wellness, Tampa Bay Rehabilitation, Robust Pain, Seminole Rehabilitation, and JRL Rehabilitation, including at least 19.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.5 hours of services that Zeya purported to personally perform, or at least directly supervise, on April 23, 2019.

(xviii) On May 1, 2019, Rehab & Healthcare, Rodriguez-Suarez, and Zeya purported to provide at least 63 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) one 15-minute patient examination that was performed on a GEICO Insured at West Florida; and (b) 144 additional physical therapy services purportedly provided to at least 22 additional GEICO Insureds at 7520 Rehabilitation, Palm Wellness, Tampa Bay Rehabilitation, Robust Pain, West Florida, Seminole Rehabilitation, and JRL Rehabilitation, including at least 19.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.25 hours of services that Zeya purported to personally perform, or at least directly supervise, on April 23, 2019.

(xix) On June 11, 2019, 7520 Rehabilitation, Rubio, and Zeya purported to provide at least 72 individual physical therapy services to at least 12 individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least nine hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya also purported to personally perform, or at least directly supervise at least: (a) three 30-minute patient examinations that were performed on three GEICO Insureds at 7520 Rehabilitation and Robust Pain; and (b) 131 additional physical therapy services purportedly provided to at least 19 additional GEICO Insureds at JRL Rehabilitation, Rehab & Healthcare, Seminole Rehabilitation, Tampa Bay Rehabilitation, and Robust Pain, including at least 21.25 hours of physical therapy services that required direct, one-

on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32.5 hours of services that Zeya purported to personally perform, or at least directly supervise, on June 11, 2019.

(xx)   On July 2, 2019, 7520 Rehabilitation, Rubio, and Zeya purported to provide at least 54 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Zeya personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Zeya <u>also</u> purported to personally perform, or at least directly supervise at least: (a) one 25-minute patient examination that was performed on a GEICO Insured at Tampa Bay Rehabilitation; and (b) 103 <u>additional</u> physical therapy services purportedly provided to at least 16 <u>additional</u> GEICO Insureds at JRL Rehabilitation, Rehab & Healthcare, Seminole Rehabilitation, Tampa Bay Rehabilitation, and Robust Pain, including at least 18 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25 hours of services that Zeya purported to personally perform, or at least directly supervise, on July 2, 2019.

31.   These are only representative examples. It is impossible that Zeya – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a massive volume of physical therapy services on individual dates, often at multiple of the Clinic Defendants on individual dates.

32.   Upon information and belief, the fraudulent billing for physical therapy services that Defendants submitted or caused to be submitted through the respective Clinic Defendants to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the Defendants submitted through the respective

Clinic Defendants to <u>all</u> the automobile insurers in the Florida automobile insurance market.

33.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

34.    Thus, upon information and belief, the impossible number of physical therapy services that Zeya purported to directly supervise or perform for GEICO Insureds at the Clinic Defendants (among other locations) on individual dates of service constituted only a fraction of the <u>total</u> number of physical therapy services that Zeya purported to directly supervise or perform at the respective Clinic Defendants, including for individuals insured by companies other than GEICO, on those same dates of service.

35.    In keeping with the fact that the Medical Director Defendants never legitimately fulfilled their required duties as "medical directors" at any of the respective Clinic Defendants, each of the claims submitted by Defendants for physical therapy services identified in Exhibits "1" – "7" falsely represented that Zeya had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement. In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by completely unsupervised massage therapists including: (i) Lanza Diaz, Couve, and Torres at JRL Rehabilitation; (ii) Reyes, Ortega, and Suarez at Palm

Wellness; (iii) Roque and Rojas at Rehab & Healthcare; (iv) Roque at Robust Pain; (v)

Alvarez at 7520 Rehabilitation; (vi) Caballero at Tampa Bay Rehabilitation; and (vii)

Del Sol Perez, Dominguez, and Bond at Seminole Care.

36.     In the claims for physical therapy services identified in Exhibits "1" – "7",

the Defendants routinely fraudulently misrepresented that the physical therapy

services were lawfully provided and reimbursable, when in fact they were neither

lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were performed – to the extent
        they were performed at all – by massage therapists without any
        legitimate supervision by anyone;

(ii)    the respective Clinic Defendants could not lawfully recover PIP Benefits
        for the putative physical therapy services, because they were performed
        by completely unsupervised massage therapists in contravention of
        Florida law; and

(iii)   the Defendants systematically fraudulently misrepresented that the
        physical therapy services were legitimately performed or supervised by
        Zeya.

## C.   The Defendants' Fraudulent Treatment and Billing Protocols

37.     In the claims identified in Exhibits "1" – "7", virtually none of the

Insureds whom the Defendants purported to treat suffered from any significant

injuries or health problems resulting from the relatively minor accidents they

experienced or purported to experience.

38.     Even so – and in keeping with the fact that Zeya, Cvik, and Fossi never

legitimately served as medical directors at the respective Clinic Defendants – the

Defendants purported to subject virtually every Insured to a medically unnecessary

course of "treatment" pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

### 1.    The Fraudulent Charges for Initial Examinations

39.    As a first step in Defendants' fraudulent treatment and billing protocol, each of the Insureds in the claims identified in Exhibits "1" - "7" purportedly received an initial examination at the respective Clinic Defendants, with Zeya purporting to personally perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "1" – "7".

40.    The purported initial examinations then were billed to GEICO in the following manner:

(i)     in the claims identified in Exhibit "1", JRL Rehabilitation, Ramos, Diaz, and Zeya billed GEICO under CPT codes 99203 and 99204 for each initial examination that Zeya purportedly provided at JRL Rehabilitation;

(ii)    in the claims identified in Exhibit "2", Palm Wellness, Reyes, and Zeya billed GEICO under CPT code 99204 for each initial examination that Zeya purportedly provided at Palm Wellness;

(iii)   in the claims identified in Exhibit "3", Rehab & Healthcare, Rodrigues-Suarez, and Zeya billed GEICO under CPT codes 99203 and 99204 for each initial examination that Zeya purportedly provided at Rehab & Healthcare;

(iv)    in the claims identified in Exhibit "4", Robust Pain, Rodrigues, Montes, Campos-Garcia, and Zeya billed GEICO under CPT code 99203 for each initial examination that Zeya purportedly provided at Robust Pain;

(v)     in the claims identified in Exhibit "5", 7520 Rehabilitation, Rubio, Cvik, Fossi, and Zeya billed GEICO under CPT code 99203 for each initial examination that Zeya purportedly provided at 7520 Rehabilitation;

(vi)    in the claims identified in Exhibit "6", Tampa Bay Rehabilitation, Moran, Cvik, and Zeya billed GEICO under CPT codes 99203 and 99204 for each initial examination that Zeya purportedly provided at Tampa Bay Rehabilitation; and

(vii)   in the claims identified in Exhibit "7", Seminole Care, Romero, Perez, Fossi, and Zeya billed GEICO under CPT code 99203 for each initial examination that Zeya purportedly provided at Seminole Care.

41.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, the use of CPT code 99204 to bill for an initial patient examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; (ii) the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician who performed the examination conducted a "comprehensive" physical examination; and (iv) the physician who performed the examination engaged in "moderate complexity" medical decision-making in connection with the examination.

42.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents – among other things – that: (i) the patient presented with problems of moderate severity; (ii) the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician who performed the examination conducted a "detailed" physical examination; and (iv) the physician who performed the examination engaged in "low complexity" medical decision-making in connection with the examination.

43.     As set forth below, the charges for the initial examinations identified in Exhibits "1" - "7" were fraudulent in that they misrepresented the nature, extent, and results of the purported initial examinations.

a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

44.     To the extent that the Insureds in the claims identified in Exhibits "1" – "7" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

45.     For instance, in the substantial majority of the claims identified in Exhibits "1" – "7" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibits "1" – "7" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

46.     Furthermore, in the substantial majority of the claims identified in Exhibits "1" – "7", contemporaneous police reports indicated that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the accidents, or injured at all.

47.     Even so, in the claims for initial examinations identified in Exhibits "1" – "7", the respective Clinic Defendants, respective Clinic Owner Defendants, respective Clinic Medical Director Defendants, and Zeya billed GEICO for the putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that

the Insureds presented with problems of moderate severity or moderate to high severity. In fact, the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems as the result of any automobile accidents at all.

48.     For example:

(i)     On June 28, 2014, an Insured named OG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that OG's vehicle was drivable following the accident. The police report further indicated that OG was not injured and did not receive medical treatment at the scene. In keeping with the fact that OG was not seriously injured, OG did not visit any hospital emergency room following the accident. To the extent that OG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of OG on June 30, 2014, JRL Rehabilitation, Rodriguez-Suarez, and Zeya billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On October 22, 2015, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not receive medical treatment at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AM on October 30, 2015, JRL Rehabilitation, Rodriguez-Suarez, and Zeya billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)   On February 16, 2016, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that AF's vehicle

was drivable following the accident. The police report further indicated that AF was not injured and did not receive medical treatment at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AF on February 25, 2016, Palm Wellness, Reyes, and Zeya billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)   On August 12, 2017, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision. The police report further indicated that LR was not injured and did not receive medical treatment at the scene. In keeping with the fact that LR was not seriously injured, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LR on August 18, 2017, Tampa Bay Rehabilitation, Moran, Cvik, and Zeya billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)   On January 19, 2018, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision. The police report further indicated that AG was not injured and did not receive medical treatment at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AG on January 25, 2018, Palm Wellness, Reyes, and Zeya billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)   On March 16, 2018, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed collision, and that CHs automobile was drivable following the accident. The police report further indicated that CH was not injured and did not receive medical treatment at the scene. In

keeping with the fact that CH was not seriously injured, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CH on March 22, 2018, Tampa Bay Rehabilitation, Moran, Cvik, and Zeya billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On August 3, 2018, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, minor collision with a pedestrian, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not receive medical treatment at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YC on August 15, 2018, Robust Pain, Roque, Montes, and Zeya billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)  On January 2, 2019, an Insured named MO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision. The police report further indicated that MO was not injured and refused medical attention at the scene. In keeping with the fact that MO was not seriously injured, MO did not visit any hospital emergency room following the accident. To the extent that MO experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MO on January 4, 2019, 7520 Rehabilitation, Rubio, Fossi, and Zeya billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)    On April 27, 2019, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit

any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CM on April 29, 2019, 7520 Rehabilitation, Rubio, Fossi, and Zeya billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)  On September 4, 2019, an Insured named MEC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a relatively minor, rear-end collision. The police report further indicated that MEC was not injured and did not receive medical treatment at the scene. In keeping with the fact that MEC was not seriously injured, MEC did not visit any hospital emergency room following the accident. To the extent that MEC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MEC on September 5, 2019, Seminole Care, Romero, Fossi, and Zeya billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

49.  These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "7", the respective Clinic Defendants, Clinic Owner Defendants, Clinic Medical Director Defendants, and Zeya virtually always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

b.   **Misrepresentations Regarding "Comprehensive" and "Detailed" Physical Examinations**

50.     In addition, in the claims for initial examinations identified in Exhibits "1" – "7", when the respective Clinic Defendants, Clinic Owner Defendants, Clinic Medical Director Defendants, and Zeya billed GEICO for the putative initial examinations using CPT codes 99203 and 99204, they falsely represented that the physician who purported to conduct the examinations – namely Zeya – conducted "detailed" or "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

51.     In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "1" – "7", neither Zeya nor any other physician or healthcare provider associated with the Clinic Defendants ever conducted a "comprehensive" patient examination because: (i) pursuant to the CPT Assistant, a "comprehensive" physical examination requires – among other things – that the physician performing the examination document a general examination of multiple patient organ systems or a complete examination of a single patient organ system; but (ii) neither Zeya nor any other physician associated with the Clinic Defendants, ever documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

52.     In addition, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" –  "7", neither Zeya nor any other physician or healthcare provider associated with the Clinic Defendants ever

conducted a "detailed" patient examination because: (i) pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination document an extended examination of the affected body areas and other symptomatic or related organ systems; but (ii) neither Zeya nor any other physician associated with the Clinic Defendants, ever documented an extended examination of the affected body areas and other symptomatic or related organ systems.

53.     For example:

(i)     On December 20, 2013, JRL Rehabilitation, Ramos, and Zeya billed GEICO under CPT code 99204 for four initial examinations of four individual Insureds named AA, AJ, TJ, and ZS that Zeya purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to AA, AJ, TJ, and ZS. However, Zeya did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(ii)    On October 2, 2014, Rehab & Healthcare, Rodriguez-Suarez, and Zeya billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named RC and RC that Zeya purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to RC and RC. However, Zeya did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(iii)   On March 31, 2015, Palm Wellness, Reyes, and Zeya billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named VG and RB that Zeya purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to VG and RB. However, Zeya did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(iv)  On November 11, 2016, Rehab & Healthcare, Rodriguez-Suarez, and Zeya billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named BG and AV that Zeya purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to BG and AV. However, Zeya did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(v)  On January 17, 2017, Palm Wellness, Reyes, and Zeya billed GEICO under CPT code 99204 for two initial examinations of two individual Insureds named FBP and CG that Zeya purported to perform, and thereby represented that they had provided "comprehensive" physical examinations to FBP and CG. However, Zeya did not document findings with respect to at least eight of the Insureds' organ systems, nor did he document a "complete" examination of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

(vi)  On August 15, 2018, Robust Pain, Roque, Montes, and Zeya billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named LC and YC that Zeya purported to perform, and thereby represented that they had provided "detailed" physical examinations LC and YC. However, Zeya did not document an extended examination of the musculoskeletal systems of LC and YC despite the fact that – to the extent LC and YC had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(vii)  On October 11, 2018, 7520 Rehabilitation, Rubio, Fossi, and Zeya billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named TC, AR, and TM that Zeya purported to perform, and thereby represented that they had provided "detailed" physical examinations TC, AR, and TM. However, Zeya did not document an extended examination of the musculoskeletal systems of TC, AR, and TM despite the fact that – to the extent TC, AR, and TM had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(viii)  On December 26, 2018, Tampa Bay Rehabilitation, Moran, Cvik, and Zeya billed GEICO under CPT code 99203 for an initial examination of an Insured named YJS that Zeya purported to perform, and thereby

represented that they had provided a "detailed" physical examination to YJS. However, Zeya did not document an extended examination of the musculoskeletal system of YJS despite the fact that – to the extent YJS had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(ix)   On May 6, 2019, Seminole Care, Romero, and Zeya billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named JR and MR that Zeya purported to perform, and thereby represented that they had provided "detailed" physical examinations JR and MR. However, Zeya did not document an extended examination of the musculoskeletal systems of JR and MR despite the fact that – to the extent JR and MR had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(x)   On September 5, 2019, Seminole Care, Perez, and Zeya billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named PC and MC that Zeya purported to perform, and thereby represented that they had provided "detailed" physical examinations PC and MC. However, Zeya did not document an extended examination of the musculoskeletal systems of PC and MC despite the fact that – to the extent PC and MC had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

54.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "7", the respective Clinic Defendants, Clinic Owner Defendants, Clinic Medical Director Defendants, and Zeya routinely falsely represented that they provided "comprehensive" or "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at higher rates than examinations that are not "comprehensive" or "detailed".

c.   **Misrepresentations Regarding the Extent of Medical Decision-Making**

55.     Moreover, in the claims for initial examinations identified in Exhibits "1" – "7", when the Clinic Defendants, Clinic Owner Defendants, Clinic Medical Director Defendants, and Zeya billed GEICO for putative initial examinations using CPT codes 99204 and 99203, they falsely represented that the physician who purported to conduct the examinations – namely Zeya – engaged in some legitimate, moderate complexity or low complexity medical decision-making in connection with the examinations.

56.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

57.     For instance, in the claims for initial examinations identified in Exhibits "1" – "7": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) Zeya did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead – at the direction of the respective Clinic Defendants and respective Clinic Owner Defendants – falsely diagnosed virtually every Insured as having an "emergency medical condition" and provided a nearly identical, pre-determined sprain/strain or similar soft tissue injury "diagnosis" for every Insured.

58.     For example:

(i)    On June 28, 2014, an Insured named OG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that OG's vehicle was drivable following the accident. The police report further indicated that OG was not injured and did not receive medical treatment at the scene. In keeping with the fact that OG was not seriously injured, OG did not visit any hospital emergency room following the accident. To the extent that OG experienced any health problems at all as the result of the accident, they were of low or minimal severity. On June 30, 2014, Zeya purported to conduct an initial examination of OG at JRL Rehabilitation. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided OG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither OG's presenting problems, nor the treatment plan provided to OG by Zeya, Ramos, and JRL Rehabilitation presented any risk of significant complications, morbidity, or mortality. To the contrary, OG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Ramos, and JRL Rehabilitation consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OG. Even so, Zeya, Ramos, and JRL Rehabilitation billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On December 9, 2015, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a relatively minor collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not receive medical treatment at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On December 9, 2015, Zeya purported to conduct an initial examination of MC at Palm Wellness. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any

significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided MC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Zeya, Reyes, and Palm Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Reyes, and Palm Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MC. Even so, Zeya, Reyes, and Palm Wellness billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)  On February 16, 2016, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that AF's vehicle was drivable following the accident. The police report further indicated that AF was not injured and did not receive medical treatment at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 25, 2016, Zeya purported to conduct an initial examination of AF at Palm Wellness. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided AF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AF's presenting problems, nor the treatment plan provided to AF by Zeya, Reyes, and Palm Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, AF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Reyes, and Palm Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AF. Even so, Zeya, Reyes, and Palm Wellness billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On August 12, 2017, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision. The police report further indicated that LR was not injured and did not receive medical treatment at the scene. In keeping with the fact that LR was not seriously injured, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 18, 2017, Zeya purported to conduct an initial examination of LR at Tampa Bay Rehabilitation. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided LR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LR's presenting problems, nor the treatment plan provided to LR by Zeya, Moran, Cvik, and Tampa Bay Rehabilitation presented any risk of significant complications, morbidity, or mortality. To the contrary, LR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Moran, Cvik, and Tampa Bay Rehabilitation consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LR. Even so, Zeya, Moran, Cvik, and Tampa Bay Rehabilitation billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)      On October 31, 2017, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM refused medical treatment at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 2, 2017, Zeya purported to conduct an initial examination of MM at Palm Wellness. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the

examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided MM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MM's presenting problems, nor the treatment plan provided to MM by Zeya, Reyes, and Palm Wellness presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Reyes, and Palm Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MM. Even so, Zeya, Reyes, and Palm Wellness billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)     On August 3, 2018, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, minor collision with a pedestrian, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not receive medical treatment at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 15, 2018, Zeya purported to conduct an initial examination of YC at Robust Pain. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided YC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YC's presenting problems, nor the treatment plan provided to YC by Zeya, Roque, Montes, and Robust Pain presented any risk of significant complications, morbidity, or mortality. To the contrary, YC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Roque, Montes, and Robust Pain consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YC. Even so, Zeya, Roque, Montes, and Robust Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Zeya

40

engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On October 16, 2018, an Insured named RB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that RB's vehicle was drivable following the accident. The police report further indicated that RB was not injured and did not receive medical treatment at the scene. In keeping with the fact that RB was not seriously injured, RB did not visit any hospital emergency room following the accident. To the extent that RB experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 18, 2018, Zeya purported to conduct an initial examination of RB at Rehab & Healthcare. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided RB with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RB's presenting problems, nor the treatment plan provided to RB by Zeya, Rodriguez-Suarez, and Rehab & Healthcare presented any risk of significant complications, morbidity, or mortality. To the contrary, RB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Rodriguez-Suarez, and Rehab & Healthcare consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RB. Even so, Zeya, Rodriguez-Suarez, and Rehab & Healthcare billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On April 27, 2019, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 29, 2019, Zeya purported to conduct an initial examination of CM at 7520 Rehabilitation. To the

extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided CM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by Zeya, Rubio, Fossi, and 7520 Rehabilitation presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Rubio, Fossi, and 7520 Rehabilitation consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CM. Even so, Zeya, Rubio, Fossi, and 7520 Rehabilitation billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Zeya engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On May 20, 2019, an Insured named EF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed collision. The police report further indicated that EF was not injured and did not receive medical treatment at the scene. In keeping with the fact that EF was not seriously injured, EF did not visit any hospital emergency room following the accident. To the extent that EF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 30, 2019, Zeya purported to conduct an initial examination of EF at JRL Rehabilitation. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided EF with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EF's presenting problems, nor the treatment plan provided to EF by Zeya, Ramos, and JRL Rehabilitation presented any risk of significant complications, morbidity, or mortality. To the contrary, EF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Ramos, and JRL Rehabilitation consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to EF. Even so, Zeya, Ramos, and JRL Rehabilitation billed GEICO for the initial examination

using CPT code 99204, and thereby falsely represented that Zeya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)   On September 4, 2019, an Insured named MEC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a relatively minor, rear-end collision. The police report further indicated that MEC was not injured and did not receive medical treatment at the scene. In keeping with the fact that MEC was not seriously injured, MEC did not visit any hospital emergency room following the accident. To the extent that MEC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 5, 2019, Zeya purported to conduct an initial examination of MEC at Seminole Care. To the extent that Zeya performed the examination in the first instance, Zeya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zeya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zeya provided MEC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MEC's presenting problems, nor the treatment plan provided to MEC by Zeya, Romero, Fossi, and Seminole Care presented any risk of significant complications, morbidity, or mortality. To the contrary, MEC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Zeya, Romero, Fossi, and Seminole Care consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MEC. Even so, Zeya, Romero, Fossi, and Seminole Care billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Zeya engaged in some legitimate, low complexity medical decision-making during the purported examination.

59.   In keeping with the fact that these putative "diagnoses" were pre-determined and phony, Zeya – at the direction of the respective Clinic Defendants and respective Clinic Owner Defendants – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more insureds who had been involved in a the same underlying accident, and recommended a substantially identical course

of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

60. For example:

(i) On April 1, 2015, two Insureds – EL and MP – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Rehab & Healthcare for initial examinations by Zeya on the <u>exact same date</u>, April 7, 2017. EL and MP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EL and MP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Rehab & Healthcare and Zeya – at the direction of Rodriguez-Suarez – provided EL and MP with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii) On June 25, 2016, <u>six</u> Insureds – MF, AF, AFJ, KM, AFS and MM – were involved in the same automobile accident. Thereafter – incredibly – all six Insureds presented at JRL Rehabilitation for initial examinations by Zeya on the <u>exact same date</u>, June 29, 2018. MF, AF, AFJ, KM, AFS, and MM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MF, AF, AFJ, KM, AFS, and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, JRL Rehabilitation and Zeya – at the direction of Ramos – provided MF, AF, AFJ, KM, AFS, and MM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all six of them.

(iii) On May 14, 2017, <u>three</u> Insureds – EF, JGV, and MFQ – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Rehab & Healthcare for initial examinations by Zeya on the <u>exact same date</u>, May 17, 2017. EF, JGV, and MFQ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EF, JGV, and MFQ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Rehab & Healthcare and Zeya – at the direction of Rodrigues-Suarez – provided EF, JGV, and

MFQ with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

(iv)    On December 11, 2017, two Insureds – LM and MC – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at JRL Rehabilitation for initial examinations by Zeya on the <u>exact same date</u>, December 13, 2017. LM and MC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LM and MC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, JRL Rehabilitation and Zeya – at the direction of Ramos – provided LM and MC with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)    On January 19, 2018, <u>three</u> Insureds – TP, AM, and AG – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at Palm Wellness for initial examinations by Zeya on the <u>exact same date</u>, January 25, 2018. TP, AM, and AG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TP, AM, and AG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Palm Wellness and Zeya – at the direction of Reyes – provided TP, AM, and AG with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

(vi)    On November 7, 2018, <u>three</u> Insureds – AG, DG, and KM – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at 7520 Rehabilitation for initial examinations by Zeya on the <u>exact same date</u>, November 9, 2018. AG, DG, and KM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AG, DG, and KM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, 7520 Rehabilitation and Zeya – at the direction of Rubio – provided AG, DG, and KM with substantially identical, phony soft tissue injury "diagnoses", and

recommended a substantially identical course of medically unnecessary treatment to all three of them.

(vii) On April 9, 2019, two Insureds – OQ and MQ – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Robust Pain for initial examinations by Zeya on the <u>exact same date</u>, April 11, 2019. OQ and MQ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that OQ and MQ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Robust Pain and Zeya – at the direction of Roque and Montes – provided OQ and MQ with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(viii) On April 27, 2019, <u>three</u> Insureds – CM, CG, and YM – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at 7520 Rehabilitation for initial examinations by Zeya on the <u>exact same date</u>, April 29, 2019. CM, CG, and YM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CM, CG, and YM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, 7520 Rehabilitation and Zeya – at the direction of Rubio – provided CM, CG, and YM with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

(ix) On August 11, 2019, <u>three</u> Insureds – HS, OW, and OR – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at 7520 Rehabilitation for initial examinations by Zeya on the <u>exact same date</u>, August 14, 2019. HS, OW, and OR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HS, OW, and OR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, 7520 Rehabilitation and Zeya – at the direction of Rubio – provided HS, OW, and OR with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

(x)     On September 4, 2019, two Insureds – MEC and PMC– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Seminole Care for initial examinations by Zeya on the <u>exact same date</u>, September 5, 2019. MEC and PMC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MEC and PMC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Seminole Care and Zeya – at the direction of Perez – provided MEC and PMC with substantially identical, phony soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

61.     Based on these phony and pre-determined soft tissue injury "diagnoses", the vast majority of the Insureds in the claims identified in Exhibits "1" – "7" were directed to return to one of the Clinic Defendants for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by completely unsupervised massage therapists including: (i) Lanza Diaz, Couve, and Torres at JRL Rehabilitation; (ii) Reyes, Ortega, and Suarez at Palm Wellness; (iii) Roque and Rojas at Rehab & Healthcare; (iv) Roque at Robust Pain; (v) Alvarez at 7520 Rehabilitation; (vi) Caballero at Tampa Bay Rehabilitation; and (vii) Del Sol Perez, Dominguez, and Bond at Seminole Care.

62.     The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT codes 99204 and 99203, and to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

63.    In the claims for initial examinations identified in Exhibits "1" – "7", the respective Clinic Owner Defendants, Clinic Defendants, and Clinic Medical Director Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)  the Clinic Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

64.    In this context, Zeya – who at all relevant times purported to serve as the "medical director" at JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, and Robust Pain – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Zeya done so, he would have observed and put a stop to these fraudulent charges for initial examinations.

65.    Likewise, Cvik – who purported to serve as the "medical director" at 7520 Rehabilitation and Tampa Bay Rehabilitation – and Fossi – who purported to serve as the "medical director" at 7520 Rehabilitation and Seminole Care – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1). Had Cvik and

Fossi done so, they would have observed and put a stop to these fraudulent charges for initial examinations.

2.     The Fraudulent Charges for Follow-Up Examinations

66.     In addition to the fraudulent initial examinations, most of the Insureds in the claims identified in Exhibits "1" - "7" purportedly received multiple, fraudulent follow-up examinations at the respective Clinic Defendants, with Zeya purporting to personally perform or directly supervise a substantial majority of the follow-up examinations in the claims identified in Exhibits "1" – "7".

67.     The purported follow-up examinations were then billed to GEICO through the Clinic Defendants, typically under CPT codes 99213 and 99214.

68.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

69.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem

focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

70.     As set forth below, the charges for the follow-up examinations identified in Exhibits "1" – "7" misrepresented the nature, extent, and results of the follow-up examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

71.     To the extent that the Insureds in the claims identified in Exhibits "1" - "7" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

72.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" - "7" presented for their putative follow-up examinations – typically weeks or even months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

73.     Even so, in the claims for the follow-up examinations identified in Exhibits "1" - "7", the Medical Director Defendants, the Clinic Defendants, and the Clinic Owner Defendants, made the following misrepresentations:

  (i)     when billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibits "1" - "7", the Medical Director Defendants, the Clinic Defendants, and the Clinic Owner Defendants

falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all; and

(ii)    when billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibits "1" – "7", the Medical Director Defendants, the Clinic Defendants, and the Clinic Owner Defendants falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

74.    For example:

(i)    On June 28, 2014, an Insured named OG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that OG's vehicle was drivable following the accident. The police report further indicated that OG was not injured and did not receive medical treatment at the scene. In keeping with the fact that OG was not seriously injured, OG did not visit any hospital emergency room following the accident. To the extent that OG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of OG on August 8, 2014, JRL Rehabilitation, Ramos, and Zeya billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that OG presented with problems of moderate to high severity.

(ii)    On October 22, 2015, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not receive medical treatment at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of AM on December 11, 2015, JRL

Rehabilitation, Ramos, and Zeya billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that AM presented with problems of moderate to high severity.

(iii)   On February 16, 2016, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that AF's vehicle was drivable following the accident. The police report further indicated that AF was not injured and did not receive medical treatment at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of AF on January 27, 2016, Palm Wellness, Reyes, and Zeya billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that AF presented with problems of moderate to high severity.

(iv)   On May 24, 2016, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a relatively minor collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not receive medical treatment at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of MM on August 15, 2016, Rehab & Healthcare, Rodriguez-Suarez, and Zeya billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that MM presented with problems of moderate to high severity.

(v)   On August 12, 2017, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision. The police report further indicated that LR was not injured and did not receive medical treatment at the scene. In keeping with the fact that LR was not seriously injured, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as

the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of LR on September 29, 2017, Tampa Bay Rehabilitation, Moran, Cvik, and Zeya billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that LR presented with problems of moderate to high severity.

(vi)     On August 3, 2018, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, minor collision with a pedestrian, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not receive medical treatment at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of YC on September 17, 2018, Robust Pain, Roque, Montes, and Zeya billed GEICO for the follow up examination using CPT code 99213 and thereby falsely represented that YC presented with problems of low to moderate severity.

(vii)    On October 16, 2018, an Insured named RB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that RB's vehicle was drivable following the accident. The police report further indicated that RB was not injured and did not receive medical treatment at the scene. In keeping with the fact that RB was not seriously injured, RB did not visit any hospital emergency room following the accident. To the extent that RB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of RB on December 5, 2018, Rehab & Healthcare, Rodriguez-Suarez, and Zeya billed GEICO for the follow up examination using CPT code 99213 and thereby falsely represented that RB presented with problems of low to moderate severity.

(viii)   On November 12, 2018, an Insured named SF was involved in an automobile accident. The contemporaneous police report indicated that

the accident was a relatively minor collision. The police report further indicated that SF did not receive medical treatment at the scene. In keeping with the fact that SF was not seriously injured, SF did not visit any hospital emergency room following the accident. To the extent that SF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of SF on December 27, 2018, Seminole Care, Romero, Fossi, and Zeya billed GEICO for the follow up examination using CPT code 99213 and thereby falsely represented that SF presented with problems of low to moderate severity.

(ix)    On January 2, 2019, an Insured named MO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision. The police report further indicated that MO was not injured and refused medical attention at the scene. In keeping with the fact that MO was not seriously injured, MO did not visit any hospital emergency room following the accident. To the extent that MO experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of MO on February 20, 2019, 7520 Rehabilitation, Rubio, Fossi, and Zeya billed GEICO for the follow up examination using CPT code 99214 and thereby falsely represented that MO presented with problems of moderate to high severity.

(x)     On April 27, 2019, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either had completely resolved or were minimal by the time the Insured received a purported follow-up examination. Even so, following a purported follow-up examination of CM on June 20, 2019, 7520 Rehabilitation, Rubio, Fossi, and Zeya billed GEICO for the follow up examination using CPT code 99213 and thereby falsely represented that CM presented with problems of low to moderate severity.

75.     These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibits "1" – "7", the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

76.     In the claims for follow-up examinations identified in Exhibits "1" – "7", the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 or 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

(ii)    **Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

77.     What is more, in the claims for follow-up examinations identified in Exhibits "1" – "7", neither Zeya nor any other physician associated with the Clinic Defendants ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

78.    Rather, following the purported follow-up examinations, Zeya – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

79.    The phony "follow-up examinations" that the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants purported to provide to the Insureds in the claims identified in Exhibits "1" – "7" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Clinic Defendants' offices.

**3.    The Fraudulent Charges for Physical Therapy**

80.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation:

(i)    The JRL Rehabilitation Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "1" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a)

56

therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) hot/cold packs; (e) neuromuscular reeducation; (f) manual therapy techniques; (g) contrast baths; (h) infrared therapy; (i) mechanical traction; and (j) vasopneumatic therapy.

(ii)     The Palm Wellness Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "2" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) neuromuscular reeducation; (e) manual therapy techniques; and (f) mechanical traction.

(iii)    The Rehab & Healthcare Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "3" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) manual therapy techniques; (e) therapeutic activities; (f) mechanical traction; and (g) infrared therapy.

(iv)     The Robust Pain Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "4" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) therapeutic activities; (e) manual therapy techniques; (f) (i) mechanical traction; and (g) hot/cold packs.

(v)      The 7520 Rehabilitation Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "5" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) manual therapy techniques; (e) hot/cold packs; and (f) mechanical traction.

(vi)     The Tampa Bay Rehabilitation Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "6" to receive

substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) ultrasound therapy; (d) therapeutic activities; (e) neuromuscular reeducation; (f) manual therapy techniques; (g) hot/cold packs; (h) infrared therapy; and (i) mechanical traction.

(vii)   The Seminole Care Defendants caused the substantial majority of Insureds in the claims identified in Exhibit "7" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) therapeutic exercises; (b) electrical stimulation therapy; (c) neuromuscular reeducation; (d) manual therapy techniques; (e) hot/cold packs; and (f) mechanical traction.

81.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

82.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

83.    By contrast, at each of the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocols. The purported "physical therapy" provided through each of the Clinic Defendants to GEICO Insureds therefore was medically useless.

84.    Furthermore, in the claims for physical therapy services identified in Exhibits "1" – "7",  the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Zeya had performed or directly supervised the services, when in fact the "physical therapy" services were performed – to the extent that they were performed at all – by completely unsupervised massage therapists associated with each of the Clinic Defendants, including: (i) Lanza Diaz, Couve, and Torres at JRL Rehabilitation; (ii) Reyes, Ortega, and Suarez at Palm Wellness; (iii) Roque and Rojas at Rehab & Healthcare; (iv) Roque at Robust Pain; (v) Alvarez at 7520 Rehabilitation; (vi) Caballero at Tampa Bay Rehabilitation; and (vii) Del Sol Perez, Dominguez, and Bond at Seminole Care.

## III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

85.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through the respective Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

86.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate

medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (b) in the case of the physical therapy services, because they were provided by unsupervised massage therapists and other unlicensed individuals in contravention of Florida law; and (c) the billing for the Fraudulent Services in many cases falsely represented that Zeya had performed or directly supervised the services.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

87.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

88.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

89.    For instance, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance.

90.    What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – by unsupervised massage therapists, and therefore were not eligible for PIP reimbursement under Florida law.

91.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

92.     Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

93.     The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

94.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $6,600,000.00.

95.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, Robust Pain, 7520 Rehabilitation, Tampa Bay Rehabilitation, and Seminole Care (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

96.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

97.    There is an actual case in controversy between GEICO and the Clinic Defendants regarding more than $850,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

98.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and operating requirements.

99.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

100.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

101.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

102.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

103.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

104.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, Robust Pain, 7520 Rehabilitation, Tampa Bay Rehabilitation, and Seminole Care have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
### Against Ramos, Lanza Diaz, and Zeya
### (Violation of RICO, 18 U.S.C. § 1962(c))

105.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

106.    JRL Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

107.    Ramos, Lanza Diaz, and Zeya knowingly have conducted and/or participated, directly or indirectly, in the conduct of JRL Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that JRL Rehabilitation was not eligible to receive under the No-Fault Law because: (i) JRL Rehabilitation unlawfully

was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the JRL Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

108.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

109.   JRL Rehabilitation's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Ramos, Lanza Diaz, and Zeya operated JRL Rehabilitation, inasmuch as JRL Rehabilitation was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for JRL Rehabilitation to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the JRL Rehabilitation Defendants continue to

attempt collection on the fraudulent billing submitted through JRL Rehabilitation to the present day.

110.    JRL Rehabilitation is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by JRL Rehabilitation in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

111.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through the JRL Rehabilitation enterprise.

112.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
Against Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez
(Violation of RICO, 18 U.S.C. § 1962(d))

113.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

114.    JRL Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

115.    Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez are or were employed by or associated with the JRL Rehabilitation enterprise.

116.   Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of JRL Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that JRL Rehabilitation was not eligible to receive under the No-Fault Law because: (i) JRL Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the JRL Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

117.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the

chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

118.   Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

119.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through the JRL Rehabilitation enterprise.

120.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against the JRL Rehabilitation Defendants
### (Under Fla. Stat. 501.201 et. seq.)

121.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

122.   The JRL Rehabilitation Defendants are actively engaged in trade and commerce in the State of Florida.

123.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

124.   The JRL Rehabilitation Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

125. The bills and supporting documents submitted or caused to be submitted by the JRL Rehabilitation Defendants to GEICO were fraudulent in that they misrepresented: (i) JRL Rehabilitation's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

126. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the JRL Rehabilitation Defendants has been materially injurious to GEICO and its Insureds.

127. The conduct of the JRL Rehabilitation Defendants was the actual and proximate cause of the damages sustained by GEICO.

128. The JRL Rehabilitation Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,300,000.00.

129. By reason of the JRL Rehabilitation Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FIFTH CAUSE OF ACTION
#### Against Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez
#### (Under Fla. Stat. 772.103 et. seq.)

130. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

131. In furtherance of the fraudulent scheme, Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez submitted or caused to be submitted thousands of

fraudulent charges through the JRL Rehabilitation enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

132.   When the billing was submitted Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) JRL Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the JRL Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

133.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

134.   This pattern of criminal activity resulted in Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez receiving more than $1,300,000.00 in PIP Benefits to which they were not entitled.

135.   Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez's pattern of criminal activity has caused GEICO to sustain damages of at least $1,300,000.00.

136.   By reason of Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SIXTH CAUSE OF ACTION**
**Against the JRL Rehabilitation Defendants**
**(Common Law Fraud)**

137.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

138.   The JRL Rehabilitation Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through JRL Rehabilitation for the Fraudulent Services.

139.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that JRL Rehabilitation was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact JRL Rehabilitation never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation

that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

140.   The JRL Rehabilitation Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JRL Rehabilitation that were not reimbursable.

141.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the JRL Rehabilitation Defendants through JRL Rehabilitation.

142.   The JRL Rehabilitation Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

143.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against the JRL Rehabilitation Defendants
### (Unjust Enrichment)

144.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

145.   As set forth above, the JRL Rehabilitation Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

146.   When GEICO paid the bills and charges submitted or caused to be submitted by the JRL Rehabilitation Defendants through JRL Rehabilitation, it reasonably believed that it was legally obligated to make such payments based on the JRL Rehabilitation Defendants' improper, unlawful, and/or unjust acts.

147.   The JRL Rehabilitation Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the JRL Rehabilitation Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

148.   The JRL Rehabilitation Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

149.   By reason of the above, the JRL Rehabilitation Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,300,000.00.

## EIGHTH CAUSE OF ACTION
### Against Reyes and Zeya
### (Violation of RICO, 18 U.S.C. § 1962(c))

150.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

151.   Palm Wellness is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

152.   Reyes and Zeya knowingly have conducted and/or participated, directly or indirectly, in the conduct of Palm Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Palm Wellness was not eligible to receive under the No-Fault Law because: (i) Palm Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Palm Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

153.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

154.   Palm Wellness's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Reyes and Zeya operated Palm Wellness, inasmuch as Palm Wellness was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Palm Wellness to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Palm Wellness Defendants continue to attempt collection on the fraudulent billing submitted through Palm Wellness to the present day.

155.   Palm Wellness is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Palm Wellness in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

156.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,260,000.00 pursuant to the fraudulent bills submitted through the Palm Wellness enterprise.

157.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### Against Reyes, Zeya, Ortega, and Suarez
### (Violation of RICO, 18 U.S.C. § 1962(d))

158.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

159.   Palm Wellness is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

160.   Reyes, Zeya, Ortega, and Suarez are or were employed by or associated with the Palm Wellness enterprise.

161.   Reyes, Zeya, Ortega, and Suarez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Palm Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Palm Wellness was not eligible to receive under the No-Fault Law because: (i) Palm Wellness unlawfully was operated in violation of the Clinic Act's medical director and

licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Palm Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

162.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

163.   Reyes, Zeya, Ortega, and Suarez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

164.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1, 260,000.00 pursuant to the fraudulent bills submitted through the Palm Wellness enterprise.

165.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against the Palm Wellness Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

166.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

167.   The Palm Wellness Defendants are actively engaged in trade and commerce in the State of Florida.

168.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

169.   The Palm Wellness Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

170.   The bills and supporting documents submitted or caused to be submitted by the Palm Wellness Defendants to GEICO were fraudulent in that they misrepresented: (i) Palm Wellness's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

171.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the Palm Wellness Defendants has been materially injurious to GEICO and its Insureds.

172.   The conduct of the Palm Wellness Defendants was the actual and proximate cause of the damages sustained by GEICO.

173.   The Palm Wellness Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1, 260,000.00.

174.   By reason of the Pain Relief Clinic Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**ELEVENTH CAUSE OF ACTION**
Against Reyes, Zeya, Ortega, and Suarez
(Under Fla. Stat. 772.103 et. seq.)

175.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

176.   In furtherance of the fraudulent scheme, Reyes, Zeya, Ortega, and Suarez submitted or caused to be submitted thousands of fraudulent charges through the Palm Wellness enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

177.   When the billing was submitted Reyes, Zeya, Ortega, and Suarez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Palm Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance;

(iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Palm Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

178.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

179.   This pattern of criminal activity resulted in Reyes, Zeya, Ortega, and Suarez receiving more than $1,260,000.00 in PIP Benefits to which they were not entitled.

180.   Reyes, Zeya, Ortega, and Suarez's pattern of criminal activity has caused GEICO to sustain damages of at least $1,260,000.00.

181.   By reason of Reyes, Zeya, Ortega, and Suarez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

<u>TWELFTH CAUSE OF ACTION</u>
Against the Palm Wellness Defendants
(Common Law Fraud)

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

183.    The Palm Wellness Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Palm Wellness for the Fraudulent Services.

184.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Palm Wellness was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Pain Relief Clinic never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

185.    The Palm Wellness Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to

81

induce GEICO to pay charges submitted through Palm Wellness that were not reimbursable.

186.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,260,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Palm Wellness Defendants through Palm Wellness.

187. The Palm Wellness Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

188.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against the Palm Wellness Defendants
### (Unjust Enrichment)

189.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

190.   As set forth above, the Palm Wellness Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

191.   When GEICO paid the bills and charges submitted or caused to be submitted by the Palm Wellness Defendants through Palm Wellness, it reasonably

believed that it was legally obligated to make such payments based on the Palm Wellness Defendants' improper, unlawful, and/or unjust acts.

192.   The Palm Wellness Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Palm Wellness Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

193.   The Palm Wellness Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

194.   By reason of the above, the Palm Wellness Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,260,000.00.

**FOURTEENTH CAUSE OF ACTION**
**Against Rodriguez-Suarez and Zeya**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

195.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

196.   Rehab & Healthcare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

197.   Rodriguez-Suarez and Zeya knowingly have conducted and/or participated, directly or indirectly, in the conduct of Rehab & Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a

continuous basis for over two years seeking payments that Rehab & Healthcare was not eligible to receive under the No-Fault Law because: (i) Rehab & Healthcare unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Rehab & Healthcare Defendants rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

198.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

199.   Rehab & Healthcare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Rodriguez-Suarez and Zeya operated Rehab & Healthcare, inasmuch as Rehab & Healthcare was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Rehab & Healthcare to function. Furthermore, the intricate planning

required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Rehab & Healthcare Defendants continue to attempt collection on the fraudulent billing submitted through Rehab & Healthcare to the present day.

200.    Rehab & Healthcare is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Rehab & Healthcare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

201.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,590,000.00 pursuant to the fraudulent bills submitted through the Rehab & Healthcare enterprise.

202.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Rodriguez-Suarez, Zeya, Roque, and Rojas**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

204.    Rehab & Healthcare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

205.   Rodriguez-Suarez, Zeya, Roque, and Rojas are or were employed by or associated with the Health and Wellness enterprise.

206.   Rodriguez-Suarez, Zeya, Roque, and Rojas knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Rehab & Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Rehab & Healthcare was not eligible to receive under the No-Fault Law because: (i) Rehab & Healthcare unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Rehab & Healthcare Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

207.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

208.   Rodriguez-Suarez, Zeya, Roque, and Rojas knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

209.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,590,000.00 pursuant to the fraudulent bills submitted through the Rehab & Healthcare enterprise.

210.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against the Rehab & Healthcare Defendants
### (Under Fla. Stat. 501.201 et. seq.)

211.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

212.   The Rehab & Healthcare Defendants are actively engaged in trade and commerce in the State of Florida.

213.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

214.    The Rehab & Healthcare Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

215.    The bills and supporting documents submitted or caused to be submitted by the Rehab & Healthcare Defendants to GEICO were fraudulent in that they misrepresented: (i) Rehab & Healthcare's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

216.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Rehab & Healthcare Defendants has been materially injurious to GEICO and its Insureds.

217.    The conduct of the Rehab & Healthcare Defendants was the actual and proximate cause of the damages sustained by GEICO.

218.    The Rehab & Healthcare Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,590,000.00.

219.    By reason of the Rehab & Healthcare Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## SEVENTEENTH CAUSE OF ACTION
### Against Rodriguez-Suarez, Zeya, Roque, and Rojas
### (Under Fla. Stat. 772.103 et. seq.)

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

221.    In furtherance of the fraudulent scheme, Rodriguez-Suarez, Zeya, Roque, and Rojas submitted or caused to be submitted thousands of fraudulent charges through the Rehab & Healthcare enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

222.    When the billing was submitted Rodriguez-Suarez, Zeya, Roque, and Rojas knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Rehab & Healthcare unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Rehab & Healthcare Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated

the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

223.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

224.    This pattern of criminal activity resulted in Rodriguez-Suarez, Zeya, Roque, and Rojas receiving more than $1,590,000.00 in PIP Benefits to which they were not entitled.

225.    Rodriguez-Suarez, Zeya, Roque, and Rojas' pattern of criminal activity has caused GEICO to sustain damages of at least $1,590,000.00.

226.    By reason of Rodriguez-Suarez, Zeya, Roque, and Rojas' conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104

### EIGHTEENTH CAUSE OF ACTION
### Against the Rehab & Healthcare Defendants
### (Common Law Fraud)

227.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

228.    The Rehab & Healthcare Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Rehab & Healthcare for the Fraudulent Services.

229.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that The Rehab & Healthcare was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Health and Wellness never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

230.   The Rehab & Healthcare Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rehab & Healthcare that were not reimbursable.

231.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,590,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Rehab & Healthcare Defendants through Rehab & Healthcare.

232.   The Rehab & Healthcare Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

233.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

NINETEENTH CAUSE OF ACTION<br>
Against the Rehab & Healthcare Defendants<br>
(Unjust Enrichment)

234.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

235.   As set forth above, the Rehab & Healthcare Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

236.   When GEICO paid the bills and charges submitted or caused to be submitted by the Rehab & Healthcare Defendants through Rehab & Healthcare, it reasonably believed that it was legally obligated to make such payments based on the Rehab & Healthcare Defendants' improper, unlawful, and/or unjust acts.

237.   The Rehab & Healthcare Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Rehab & Healthcare Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

238.   The Rehab & Healthcare Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

239.   By reason of the above, the Rehab & Healthcare Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,590,000.00.

**TWENTIETH CAUSE OF ACTION**
**Against Roque, Montes, Campos-Garcia, and Zeya**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

240.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

241.   Robust Pain is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

242.   Roque, Montes, Campos-Garcia, and Zeya knowingly have conducted and/or participated, directly or indirectly, in the conduct of Robust Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Robust Pain was not eligible to receive under the No-Fault Law because: (i) Robust Pain unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Robust Pain Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were

subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

243. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

244. Robust Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Roque, Montes, Campos-Garcia, and Zeya operated Robust Pain, inasmuch as Robust Pain was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Robust Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Robust Pain Defendants continue to attempt collection on the fraudulent billing submitted through Robust Pain to the present day.

245. Robust Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Robust Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

246.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through the Robust Pain enterprise.

247.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

TWENTY-FIRST CAUSE OF ACTION
Against Roque, Montes, Campos-Garcia, and Zeya
(Violation of RICO, 18 U.S.C. § 1962(d))

248.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

249.   Robust Pain is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

250.   Roque, Montes, Campos-Garcia, and Zeya are or were employed by or associated with the Robust Pain enterprise.

251.   Roque, Montes, Campos-Garcia, and Zeya knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Robust Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Robust Pain was not eligible to receive under the No-Fault Law because: (i) Robust Pain unlawfully was operated in violation of the Clinic Act's medical director and

licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Robust Pain Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

252.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

253.   Roque, Montes, Campos-Garcia, and Zeya knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

254.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through the Robust Pain enterprise.

255.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-SECOND OF ACTION**
**Against the Robust Pain Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

256.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

257.    The Robust Pain Defendants are actively engaged in trade and commerce in the State of Florida.

258.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

259.    The Robust Pain Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

260.    The bills and supporting documents submitted or caused to be submitted by the Robust Pain Defendants to GEICO were fraudulent in that they misrepresented: (i) Robust Pain's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

261.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.    Additionally, the conduct of the Robust Pain Defendants has been materially injurious to GEICO and its Insureds.

262.   The conduct of the Robust Pain Defendants was the actual and proximate cause of the damages sustained by GEICO.

263.   The Robust Pain Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $180,000.00.

264.   By reason of the Robust Pain Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**TWENTY-THIRD CAUSE OF ACTION**
**Against Roque, Montes, Campos-Garcia, and Zeya**
**(Under Fla. Stat. 772.103 et. seq.)**

265.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

266.   In furtherance of the fraudulent scheme, Roque, Montes, Campos-Garcia, and Zeya submitted or caused to be submitted thousands of fraudulent charges through the Robust Pain enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

267.   When the billing was submitted Roque, Montes, Campos-Garcia, and Zeya knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Robust Pain unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and

were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Robust Pain Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

268.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

269.   This pattern of criminal activity resulted in Roque, Montes, Campos-Garcia, and Zeya receiving more than $180,000.00 in PIP Benefits to which they were not entitled.

270.   Roque, Montes, Campos-Garcia, and Zeya's pattern of criminal activity has caused GEICO to sustain damages of at least $180,000.00.

By reason of Roque, Montes, Campos-Garcia, and Zeya's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against the Robust Pain Defendants**
**(Common Law Fraud)**

271.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

272.   The Robust Pain Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Robust Pain for the Fraudulent Services.

273.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Robust Pain was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Robust Pain never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

274.   The Robust Pain Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Robust Pain that were not reimbursable.

275.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its

business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Robust Pain Defendants through Robust Pain.

276.   The   Robust   Pain   Defendants'   extensive   fraudulent   conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

277.   Accordingly,   by   virtue   of   the   foregoing,   GEICO   is   entitled   to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIFTH CAUSE OF ACTION**
**Against the Robust Pain Defendants**
**(Unjust Enrichment)**

278.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

279.   As set forth above, the Robust Pain Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

280.   When GEICO paid the bills and charges submitted or caused to be submitted by the Robust Pain Defendants through Robust Pain, it reasonably believed that it was legally obligated to make such payments based on the Robust Pain Defendants' improper, unlawful, and/or unjust acts.

281.   The Robust Pain Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Robust Pain Defendants

voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

282.   The Robust Pain Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

283.   By reason of the above, the Robust Pain Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $180,000.00.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Rubio, Cvik, and Fossi**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

284.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

285.   7520 Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

286.   Rubio, Cvik, and Fossi knowingly have conducted and/or participated, directly or indirectly, in the conduct of 7520 Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that 7520 Rehabilitation was not eligible to receive under the No-Fault Law because: (i) 7520 Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided

– to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the 7520 Rehabilitation Defendants rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

287.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

288.   7520 Rehabilitation's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Rubio, Cvik, and Fossi operated 7520 Rehabilitation, inasmuch as 7520 Rehabilitation was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for 7520 Rehabilitation to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the 7520 Rehabilitation Defendants continue to attempt collection on the fraudulent billing submitted through 7520 Rehabilitation to the present day.

289.    7520 Rehabilitation is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by 7520 Rehabilitation in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

290.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $875,000.00 pursuant to the fraudulent bills submitted through the 7520 Rehabilitation enterprise.

291.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Rubio, Cvik, Fossi, Zeya, and Alvarez
### (Violation of RICO, 18 U.S.C. § 1962(d))

292.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

293.    7520 Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

294.    Rubio Cvik, Fossi, Zeya, and Alvarez are or were employed by or associated with the 7520 Rehabilitation enterprise.

295.    Rubio Cvik, Fossi, Zeya, and Alvarez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of 7520 Rehabilitation's affairs through a pattern of racketeering activity consisting of

repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that 7520 Rehabilitation was not eligible to receive under the No-Fault Law because: (i) 7520 Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the 7520 Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

296.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

297.   Rubio Cvik, Fossi, Zeya, and Alvarez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other

automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

298.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $875,000.00 pursuant to the fraudulent bills submitted through the 7520 Rehabilitation enterprise.

299.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-EIGHT CAUSE OF ACTION**
**Against 7520 Rehabilitation Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

300.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

301.   The 7520 Rehabilitation Defendants are actively engaged in trade and commerce in the State of Florida.

302.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

303.   The 7520 Rehabilitation Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

304.   The bills and supporting documents submitted or caused to be submitted by the 7520 Rehabilitation Defendants to GEICO were fraudulent in that they misrepresented: (i) 7520 Rehabilitation's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to

GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

305.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the 7520 Rehabilitation Defendants has been materially injurious to GEICO and its Insureds.

306.   The conduct of the 7520 Rehabilitation Defendants was the actual and proximate cause of the damages sustained by GEICO.

307.   The 7520 Rehabilitation Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $875,000.00.

308.   By reason of the 7520 Rehabilitation Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**TWENTY-NINTH CAUSE OF ACTION**
**Against Rubio, Cvik, Fossi, Zeya, and Alvarez**
**(Under Fla. Stat. 772.103 et. seq.)**

309.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

310.   In furtherance of the fraudulent scheme, Rubio Cvik, Fossi, Zeya, and Alvarez submitted or caused to be submitted thousands of fraudulent charges through the 7520 Rehabilitation enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

311.   When the billing was submitted Rubio Cvik, Fossi, Zeya, and Alvarez knew that the billing contained false and misleading information concerning facts

material to the claims for which reimbursement was being sought in that: (i) 7520 Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the 7520 Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

312.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

313.   This pattern of criminal activity resulted in Rubio, Cvik, and Fossi receiving more than $875,000.00 in PIP Benefits to which they were not entitled.

314.   Rubio Cvik, Fossi, Zeya, and Alvarez's pattern of criminal activity has caused GEICO to sustain damages of at least $875,000.00.

315.    By reason of Rubio Cvik, Fossi, Zeya, and Alvarez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**THIRTIETH CAUSE OF ACTION**
**Against the 7520 Rehabilitation Defendants**
**(Common Law Fraud)**

316.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

317.    The 7520 Rehabilitation Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through 7520 Rehabilitation for the Fraudulent Services.

318.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that 7520 Rehabilitation was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact 7520 Rehabilitation never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent

Services actually were performed, when in many cases they were not actually performed.

319.   The 7520 Rehabilitation Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through 7520 Rehabilitation that were not reimbursable.

320.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $875,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the 7520 Rehabilitation Defendants through 7520 Rehabilitation.

321.   The 7520 Rehabilitation Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

322.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-FIRST CAUSE OF ACTION
#### Against the 7520 Rehabilitation Defendants
#### (Unjust Enrichment)

323.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

324.   As set forth above, the 7520 Rehabilitation Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

325.   When GEICO paid the bills and charges submitted or caused to be submitted by the 7520 Rehabilitation Defendants through 7520 Rehabilitation, it reasonably believed that it was legally obligated to make such payments based on the 7520 Rehabilitation Defendants' improper, unlawful, and/or unjust acts.

326.   The 7520 Rehabilitation Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the 7520 Rehabilitation Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

327.   The 7520 Rehabilitation Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

328.   By reason of the above, the 7520 Rehabilitation Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $875,000.00.

**THIRTY-SECOND CAUSE OF ACTION**
**Against Moran and Cvik**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

329.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

330.   Tampa Bay Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

331.   Moran and Cvik knowingly have conducted and/or participated, directly or indirectly, in the conduct of Tampa Bay Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Tampa Bay Rehabilitation was not eligible to receive under the No-Fault Law because: (i) Tampa Bay Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Tampa Bay Rehabilitation Defendants rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

332.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

333.   Tampa Bay Rehabilitation's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moran and Cvik operated Global Care, inasmuch as Tampa Bay Rehabilitation was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Tampa Bay Rehabilitation to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Tampa Bay Rehabilitation Defendants continue to attempt collection on the fraudulent billing submitted through Tampa Bay Rehabilitation to the present day.

334.   Tampa Bay Rehabilitation is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tampa Bay Rehabilitation in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

335.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $565,000.00 pursuant to the fraudulent bills submitted through the Tampa Bay Rehabilitation enterprise.

336.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRTY-THIRD CAUSE OF ACTION
### Against Moran, Cvik, Zeya, and Caballero
### (Violation of RICO, 18 U.S.C. § 1962(d))

337.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

338.   Tampa Bay Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

339.   Moran, Cvik, Zeya, and Caballero are or were employed by or associated with the Tampa Bay Rehabilitation enterprise.

340.   Moran, Cvik, Zeya, and Caballero knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Tampa Bay Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Tampa Bay Rehabilitation was not eligible to receive under the No-Fault Law because: (i) Tampa Bay Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Tampa Bay Rehabilitation

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

341.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

342.   Moran, Cvik, Zeya, and Caballero knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

343.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $565,000.00 pursuant to the fraudulent bills submitted through the Tampa Bay Rehabilitation enterprise.

344.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-FOURTH CAUSE OF ACTION
### Against the Tampa Bay Rehabilitation Defendants
### (Under Fla. Stat. 501.201 et. seq.)

345.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

346.    The Tampa Bay Rehabilitation Defendants are actively engaged in trade and commerce in the State of Florida.

347.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

348.    The Tampa Bay Rehabilitation Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

349.    The bills and supporting documents submitted or caused to be submitted by the Tampa Bay Rehabilitation Defendants to GEICO were fraudulent in that they misrepresented: (i) Tampa Bay Rehabilitation's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

350.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the Tampa Bay Rehabilitation Defendants has been materially injurious to GEICO and its Insureds.

351.    The conduct of the Tampa Bay Rehabilitation Defendants was the actual and proximate cause of the damages sustained by GEICO.

352.   The Tampa Bay Rehabilitation Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $565,000.00.

353.   By reason of the Tampa Bay Rehabilitation Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**THIRTY-FIFTH CAUSE OF ACTION**
**Against Moran, Cvik, Zeya, and Caballero**
**(Under Fla. Stat. 772.103 et. seq.)**

354.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

355.   In furtherance of the fraudulent scheme, Moran, Cvik, Zeya, and Caballero submitted or caused to be submitted thousands of fraudulent charges through the Tampa Bay Rehabilitation enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

356.   When the billing was submitted Moran, Cvik, Zeya, and Caballero knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Tampa Bay Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all

– pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Tampa Bay Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

357. These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

358. This pattern of criminal activity resulted in Moran, Cvik, Zeya, and Caballero receiving more than $565,000.00 in PIP Benefits to which they were not entitled.

359. Moran, Cvik, Zeya, and Caballero's pattern of criminal activity has caused GEICO to sustain damages of at least $565,000.00.

360. By reason of Moran, Cvik, Zeya, and Caballero's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## THIRTY-SIXTH CAUSE OF ACTION
### Against the Tampa Bay Rehabilitation Defendants
### (Common Law Fraud)

361.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

362.    The Tampa Bay Rehabilitation Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Tampa Bay Rehabilitation for the Fraudulent Services.

363.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Tampa Bay Rehabilitation was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Tampa Bay Rehabilitation never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

364.   The Tampa Bay Rehabilitation Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tampa Bay Rehabilitation that were not reimbursable.

365.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $565,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Tampa Bay Rehabilitation Defendants through Tampa Bay Rehabilitation.

366.   The Tampa Bay Rehabilitation Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

367.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<u>THIRTY-SEVENTH CAUSE OF ACTION</u>
Against the Tampa Bay Rehabilitation Defendants
(Unjust Enrichment)

368.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

369.   As set forth above, the Tampa Bay Rehabilitation Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

370.   When GEICO paid the bills and charges submitted or caused to be submitted by the Tampa Bay Rehabilitation Defendants through Tampa Bay Rehabilitation, it reasonably believed that it was legally obligated to make such payments based on the Tampa Bay Rehabilitation Defendants' improper, unlawful, and/or unjust acts.

371.   The Tampa Bay Rehabilitation Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Tampa Bay Rehabilitation Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

372.   The Tampa Bay Rehabilitation Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

373.   By reason of the above, the Tampa Bay Rehabilitation Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $565,000.00.

## THIRTY-EIGHTH CAUSE OF ACTION
### Against Romero, Del Sol Perez, and Fossi
### (Violation of RICO, 18 U.S.C. § 1962(c))

374.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

375.   Seminole Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

376.   Romero, Del Sol Perez, and Fossi knowingly have conducted and/or participated, directly or indirectly, in the conduct of Seminole Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Seminole Care was not eligible to receive under the No-Fault Law because: (i) Seminole Care unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Seminole Care Defendants rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

377.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

378.   Seminole Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Romero, Del Sol Perez, and Fossi operated Seminole Care, inasmuch as Seminole Care was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Seminole Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Seminole Care Defendants continue to attempt collection on the fraudulent billing submitted through Seminole Care to the present day.

379.   Seminole Care is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Seminole Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

380.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $835,000.00 pursuant to the fraudulent bills submitted through the Seminole Care enterprise.

381.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTY-NINTH CAUSE OF ACTION**
**Against Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

382.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

383.   Seminole Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

384.   Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond are or were employed by or associated with the Seminole Care enterprise.

385.   Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Seminole Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Seminole Care was not eligible to receive under the No-Fault Law because: (i) Seminole Care unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent

that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Seminole Care Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

386.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

387.   Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

388.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $835,000.00 pursuant to the fraudulent bills submitted through the Seminole Care enterprise.

389.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTIETH CAUSE OF ACTION
### Against the Seminole Care Defendants
### (Under Fla. Stat. 501.201 et. seq.)

390.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

391.   The Seminole Care Defendants are actively engaged in trade and commerce in the State of Florida.

392.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

393.   The Seminole Care Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

394.   The bills and supporting documents submitted or caused to be submitted by the Seminole Care Defendants to GEICO were fraudulent in that they misrepresented: (i) Seminole Care's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

395.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the Seminole Care Defendants has been materially injurious to GEICO and its Insureds.

396.   The conduct of Seminole Care Defendants was the actual and proximate cause of the damages sustained by GEICO.

397.   The Seminole Care Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $835,000.00.

398.   By reason of the Seminole Care Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FORTY-FIRST CAUSE OF ACTION**
**Against Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond**
**(Under Fla. Stat. 772.103 et. seq.)**

399.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

400.   In furtherance of the fraudulent scheme, Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond submitted or caused to be submitted thousands of fraudulent charges through the Seminole Care enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

401.   When the billing was submitted Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Seminole Care unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they

were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Seminole Care Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

402.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

403.   This pattern of criminal activity resulted in Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond receiving more than $835,000.00 in PIP Benefits to which they were not entitled.

404.   Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond's pattern of criminal activity has caused GEICO to sustain damages of at least $835,000.00.

405.   By reason of Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-SECOND CAUSE OF ACTION**
**Against the Seminole Care Defendants**
**(Common Law Fraud)**

406.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-95 above.

407.   The Seminole Care Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Seminole Care for the Fraudulent Services.

408.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Seminole Care was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Seminole Care never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

409.   The Seminole Care Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Seminole Care that were not reimbursable.

410.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $835,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Seminole Care Defendants through Seminole Care.

411.   The Seminole Care Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

412.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FORTY-THIRD CAUSE OF ACTION**
**Against the Seminole Care Defendants**
**(Unjust Enrichment)**

413.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-95 above.

414.   As set forth above, the Seminole Care Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

415.   When GEICO paid the bills and charges submitted or caused to be submitted by the Seminole Care Defendants through Seminole Care, it reasonably believed that it was legally obligated to make such payments based on the Seminole Care Defendants' improper, unlawful, and/or unjust acts.

416.   The Seminole Care Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Seminole Care Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

417.   The Seminole Care Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

418.   By reason of the above, the Seminole Care Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $835,000.00.

### JURY DEMAND

419.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, Robust Pain, 7520 Rehabilitation, Tampa Bay Rehabilitation, and Seminole Care, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that JRL Rehabilitation, Palm Wellness, Rehab & Healthcare, Robust Pain, 7520 Rehabilitation, Tampa Bay Rehabilitation, and Seminole Care have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Ramos, Lanza Diaz, and Zeya, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,300,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against JRL Rehabilitation, Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez, compensatory damages in an amount to be determined at trial but in excess of $1,300,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez, compensatory damages in an amount to be determined at trial but in excess of $1,300,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against JRL Rehabilitation, Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez, compensatory damages in an amount to be determined at trial but in excess of $1,300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against JRL Rehabilitation, Ramos, Lanza Diaz, Zeya, Couve, Torres, and Fernandez, more than $1,300,000.00 in compensatory

damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Reyes and Zeya, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,260,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Reyes, Zeya, Ortega, and Suarez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,260,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against Palm Wellness, Reyes, Zeya, Ortega, and Suarez, compensatory damages in an amount to be determined at trial but in excess of $1,260,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.     On the Eleventh Cause of Action against Reyes, Zeya, Ortega, and Suarez, compensatory damages in an amount to be determined at trial but in excess of $1,260,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.     On the Twelfth Cause of Action against Palm Wellness, Reyes, Zeya, Ortega, and Suarez, compensatory damages in an amount to be determined at trial but in excess of $1,260,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Palm Wellness, Reyes, Zeya, Ortega, and Suarez, more than $1,260,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Rodriguez-Suarez and Zeya, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,590,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Rodriguez-Suarez, Zeya, Roque, and Rojas, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,590,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Rehab & Healthcare, Rodriguez-Suarez, Zeya, Roque, and Rojas, compensatory damages in an amount to be determined at trial but in excess of $1,590,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against Rodriguez-Suarez, Zeya, Roque, and Rojas, compensatory damages in an amount to be determined at trial but in excess of $1,590,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

R.      On the Eighteenth Cause of Action against Rehab & Healthcare, Rodriguez-Suarez, Zeya, Roque, and Rojas, compensatory damages in an amount to

be determined at trial but in excess of $1,590,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Rehab & Healthcare, Rodriguez-Suarez, Zeya, Roque, and Rojas, more than $1,590,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Roque, Montes, Campos-Garcia, and Zeya, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $180,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Roque, Montes, Campos-Garcia, and Zeya, compensatory damages in of GEICO in an amount to be determined at trial but in excess of $180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Robust Pain, Roque, Montes, Campos-Garcia, and Zeya, compensatory damages in an amount to be determined at trial but in excess of $180,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

W.      On the Twenty-Third Cause of Action against Robust Pain, Roque, Montes, Campos-Garcia, and Zeya, compensatory damages in an amount to be determined at trial but in excess of $180,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

X.     On the Twenty-Fourth Cause of Action against Robust Pain, Roque, Montes, Campos-Garcia, and Zeya, compensatory damages in an amount to be determined at trial but in excess of $180,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against Robust Pain, Roque, Montes, Campos-Garcia, and Zeya, more than $180,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.     On the Twenty-Sixth Cause of Action against Rubio, Cvik, and Fossi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $875,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.     On the Twenty-Seventh Cause of Action against Rubio, Cvik, Fossi, Zeya, and Alvarez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $875,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.     On the Twenty-Eighth Cause of Action against 7520 Rehabilitation, Rubio, Cvik, Fossi, Zeya, and Alvarez, compensatory damages in an amount to be determined at trial but in excess of $875,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

CC.     On the Twenty-Ninth Cause of Action against Rubio, Cvik, Fossi, Zeya, and Alvarez, damages in an amount to be determined at trial but in excess of

$875,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

DD.   On the Thirtieth Cause of Action against 7520 Rehabilitation, Rubio, Cvik, Fossi, Zeya, and Alvarez, compensatory damages in an amount to be determined at trial but in excess of $875,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.   On the Thirty-First Cause of Action against 7520 Rehabilitation, Rubio, Cvik, Fossi, Zeya, and Alvarez, more than $875,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.   On the Thirty-Second Cause of Action against Moran and Cvik, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $565,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.   On the Thirty-Third Cause of Action against Moran, Cvik, Zeya, and Caballero, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $565,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.   On the Thirty-Fourth Cause of Action against Tampa Bay Rehabilitation, Moran, Cvik, Zeya, and Caballero, compensatory damages in an amount to be determined at trial but in excess of $565,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

II.     On the Thirty-Fifth Cause of Action against Moran, Moran, Cvik, Zeya, and Caballero, compensatory damages in an amount to be determined at trial but in excess of $565,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

JJ.     On the Thirty-Sixth Cause of Action against Tampa Bay Rehabilitation, Moran, Cvik, Zeya, and Caballero, compensatory damages in an amount to be determined at trial but in excess of $565,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

KK.     On the Thirty-Seventh Cause of Action against Tampa Bay Rehabilitation, Moran, Cvik, Zeya, and Caballero, more than $565,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

LL.     On the Thirty-Eight Cause of Action against Romero, Del Sol Perez, and Fossi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $835,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

MM.     On the Thirty-Ninth Cause of Action against Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $835,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

NN.     On the Fortieth Cause of Action against Seminole Care, Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond, compensatory damages in an amount to be

138

determined at trial but in excess of $835,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

OO.    On the Forty-First Cause of Action against Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond, compensatory damages in an amount to be determined at trial but in excess of $835,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

PP.    On the Forty-Second Cause of Action against Seminole Care, Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond, compensatory damages in an amount to be determined at trial but in excess of $835,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against Seminole Care, Romero, Del Sol Perez, Fossi, Zeya, Dominguez, and Bond, more than $835,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:        April 30, 2021

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone: (904) 598-6100
Facsimile: (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

*Attorneys for Plaintiffs*